# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH HUNTER, LINDA STOIKE, and WILLIAM GARRAUGHTY, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| | ) | Case No.  09 CV 6178 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Rebecca Pallmeyer |
| FIRST TRANSIT, INC., | ) ) | Magistrate Judge Susan Cox |
| Defendant. | ) | |

| | | |
|---|---|---|
| TASHA JOSHAWAY, MICHAEL YURKOWSKI, GEORGE BECKETT, DEBBIE GOIN, and PENNIE JOHNSON, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| | ) | Case No.  10 CV 7002 |
| Plaintiffs, | ) ) | |
| | ) | Judge Rebecca Pallmeyer |
| v. | ) ) | Magistrate Judge Susan Cox |
| FIRST STUDENT, INC., | ) ) | |
| Defendant | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR UNCONTESTED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES

# TABLE OF CONTENTS

**I.    BACKGROUND** .................................................................................................. **1**

A.    Prior Proceedings and Mediation ................................................................. 2

B.    The Terms of the Parties' Proposed Agreement ......................................... 5

1.    Monetary Relief ................................................................................ 5

2.    Non-Monetary Relief ........................................................................ 8

C.    Notice and Claims Administration................................................................ 8

1.    Original Mailing of Notice................................................................ 8

2.    Subsequent Mailings of Notice ........................................................ 9

3.    Response from Class Members ........................................................ 10

**II.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.** ...................... **11**

A.    Legal Standard ........................................................................................... 11

B.    Application of the Seventh Circuit's Factors Strongly Support Final Approval of
the Settlement Agreement ......................................................................... 13

1.    Plaintiffs' case on the merits, balanced against the Defendants' settlement
offer    ............................................................................................... 15

a.    Disclosure Fund Participants ........................................... 15

b.    No Authorization Fund Participants ................................. 15

c.    No Authorization Terminated Fund Participants ............ 16

d.    Adverse Action Fund Participants ................................... 18

2.    The likely complexity, length, and expense of further litigation and the
public interest.................................................................................. 19

3.    The amount of opposition to the settlement and the reactions of members
of the class to the settlement. ......................................................... 19

a.    Objections ....................................................................... 20

b.    Opt Outs .......................................................................... 22

4.    The opinion of competent counsel ................................................. 18

     5.     The stage of the proceedings and the amount of discovery completed .... 23

**III.    THE NOTICE PROVIDED TO THE CLASS SATISFIES RULE 23(e) AND DUE PROCESS. .................................................................................................... 24**

**IV.    THE REQUIREMENTS OF RULE 23(a) AND 23(b)(3) HAVE BEEN SATISIFIED. ...................................................................................................... 11**

    A.     The Requirements of the Rule 23(a) Are Satisfied. ............................... 11

    B.     The Requirements of the Rule 23(b)(3) Are Satisfied. ......................... 26

**V.    THE AGREED UPON ATTORNEYS' FEES ARE REASONABLE AND WITHIN THE RANGE OF POSSIBLE APPROVAL. .................................................... 11**

**VI.    THE PROPOSED INCENTIVE AWARD IS REASONABLE AND WITHIN THE RANGE OF POSSIBLE APPROVAL. .......................................................... 11**

**VII.   CONCLUSION. ...................................................................................... 11**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs submit their memorandum in support of their uncontested motion for final approval of the proposed settlement and award of attorneys' fees in the above-captioned cases. The parties proposed settlement agreement is attached hereto as Exhibit A. In support of this motion, Plaintiffs state as follows:

## I.      BACKGROUND

The above-captioned cases arise out of First Transit's and First Student's procurement and use of criminal background check reports, between October 5, 2007 and August 10, 2010 (the "Class Period"). Plaintiffs allege, on behalf of themselves and a nationwide class of 143,585 persons similarly situated, that First Transit and First Student (collectively "Defendants") violated the Fair Credit Reporting Act ("FCRA") throughout the Class Period by not abiding by one or more of the following statutory requirements when procuring or using consumer reports about class members:

> 15 U.S.C. § 1681b(b)(2)(A)(i) – requiring an employer to disclose to an employee or employment applicant, in a document consisting solely of the disclosure, that a consumer report may be obtained about the individual for employment purposes.

> 15 U.S.C. § 1681b(b)(2)(A)(ii) – requiring an employer to obtain an employee's or employment applicant's written authorization before procuring a consumer report.

> 15 U.S.C. § 1681b(b)(3) – requiring an employer intending to take adverse action based in whole or in part on a consumer report, to first provide the employee or employment applicant a copy of the consumer report and a summary of their rights under the FCRA, as published by the Federal Trade Commission (the "FTC's Summary of FCRA Rights").

Defendants contend that they did not violate Plaintiffs' FCRA rights or, at most, that any violations were technical in nature and non-willful.

On October 5, 2009, Named Plaintiffs Elizabeth Hunter and William Garraughty filed a nationwide class action complaint in the United States District Court for the Northern District of Illinois (hereinafter "the First Transit Action"), alleging that First Transit violated the FCRA by taking adverse action against a putative class of employees and employment applicants based on consumer reports without first providing the putative class members a copy of their consumer report and the FTC's Summary of FCRA Rights.  *See* 15 U.S.C. § 1681b(b)(3).

On October 5, 2009, Named Plaintiffs Tasha Joshaway, Michael Yurkowski, and Debbie Goin filed a nearly identical nationwide class action complaint in the United States District Court for the Central District of Illinois (hereinafter "the First Student Action").  Their Complaint alleged that First Student also took adverse action against a putative class of employees and employment applicants based on consumer reports without first providing the putative class members a copy of their consumer reports and the FTC's Summary of FCRA Rights.  *Id.*  Like the First Transit Plaintiffs, Joshaway, Yurkowski, and Goin alleged that the Defendants fired them from their jobs based on the results of criminal background check reports procured from a third-party vendor without first providing them an opportunity to dispute the accuracy of the reports.

On November 23, 2009, Defendants filed their Answers in the First Transit and First Student Actions denying the principal allegations in the Plaintiffs' Complaints.

On January 14 and 15, 2010, the Plaintiffs in the First Transit and First Student Actions filed Amended Complaints adding allegations that First Transit and First Student procured consumer reports about Plaintiffs and a putative class of employees and employment applicants without first disclosing, in a document consisting solely of the disclosure, that a consumer report might be obtained about them for employment purposes.  *See* 15 U.S.C. § 1681b(b)(2)(A)(i).

The Plaintiffs have argued that the FCRA disclosure they received from Defendants did not consist "solely" of the disclosure because it required Plaintiffs to release the background check company, USIS Commercial Services, Inc. ("USIS"), from any liability associated with furnishing the criminal background check reports to Defendants. The disclosure form also required Plaintiffs to authorize USIS to share information about the Plaintiffs with other customers that subscribed to USIS's database. The parties have referred to the disclosure form in question as the "Part I Form." *See* Exhibit C to the Parties' Settlement Agreement (Part I Form).

On January 28, 2010, Defendants filed their Answers in the First Transit and First Student Actions denying the principal allegations in the Plaintiffs' Amended Complaints.

On April 9, 2010, the Plaintiffs in the First Transit Action filed a Second Amended Complaint adding allegations that First Transit procured consumer reports about Plaintiff Elizabeth Hunter and a putative class of employees without their written authorization. *See* 15 U.S.C. § 1681b(b)(2)(A)(ii). On April 14, 2010, the Named Plaintiffs in the First Student Action filed a Second Amended Complaint adding allegations that First Student procured consumer reports about Plaintiff George Beckett and a putative class of employees without their written authorization. *Id.* Plaintiffs have argued that Defendants obtained background check reports about thousands of former Laidlaw Education Services, Inc. and Laidlaw Transit, Inc. employees without first obtaining their written authorization.[1]

On April 28, 2010 and May 6, 2010, Defendants filed their Answers in the First Student and First Transit Actions denying the principal allegations in Plaintiffs' Second Amended Complaints.

---

[1] In late-2007, Laidlaw Education Services, Inc. and Laidlaw Transit, Inc. were merged into First Student, Inc. and First Transit, Inc.

In May 2010, in an effort to facilitate settlement, both Courts entered orders indefinitely continuing the discovery deadlines in the First Student and First Transit Actions while the parties voluntarily mediated the claims alleged in Plaintiffs' Second Amended Complaints.

During discovery, Defendants produced and Plaintiffs reviewed more than 30,000 documents. Those documents included records used to terminate approximately 795 First Student and First Transit employees because of criminal background check reports as well as policy and procedure manuals related to First Student's and First Transit's procedures for conducting criminal background checks. Defendants also allowed Plaintiffs to conduct a lengthy interview of First Student's International Vice President of Safety, Gary Catapano, who had substantial involvement in crafting Defendants' procedures for conducting criminal background checks during the relevant time period; and Russ Iddings, Director of Human Resources for FirstGroup America, to confirm Defendants' current compliance with the FCRA.[2]

On August 30 and 31, 2010, the parties met with Professor Lynn Cohn of Northwestern University Law School in an effort to resolve the Plaintiffs' claims. The parties were unable to reach agreement at the conclusion of their two-day mediation session, but they continued to negotiate for several more weeks. Finally, in late September 2010, the parties signed a memorandum of understanding setting forth the material terms of their Settlement Agreement. On October 29, 2010, the district court judge presiding over the First Student Action transferred the case to the Northern District of Illinois for consolidation with the First Transit Action.

On January 13 and January 25, 2011, the Plaintiffs filed Third Amended Complaints in the First Transit and First Student Actions. The Third Amended Complaints added allegations

---

[2] Additionally, after the parties agreed to settle the case, the Defendants produced a detailed, forty-one page affidavit from their corporate representative describing how Defendants determined how many Class Members were included in each participant group.

that the Defendants had obtained and used consumer reports from a company named AFR Consortium Associates, LLC ("AFR") without Plaintiffs' written authorization. The Third Amended Complaints further alleged that the Defendants used the AFR consumer reports to take adverse action against Plaintiffs and other putative class members without providing Plaintiffs and putative class members a copy of the AFR consumer reports and the FTC's Summary of FCRA Rights.

On January 26, 2011 and February 8, 2011, Defendants filed their Answers, denying the principal allegations in Plaintiffs' Third Amended Complaints.

**B.  The Terms of the Parties' Proposed Agreement**

On March 15, 2011, the Court issued an order preliminarily approving the parties' settlement agreement and instructing the Settlement Administrator to issue notice to the class. The parties' settlement agreement creates a $5.9 million settlement fund to compensate the class, pay for Class Counsel's attorneys' fees, pay for the costs of settlement administration, and pay incentive awards to the named plaintiffs. *See* Ex. A.

**1.  Monetary Relief**

The Settlement provides that the Fund will be divided into four smaller sub-funds, with each sub-fund distributed to Class Members who suffered similar FCRA violations. Under Plaintiffs' proposal, $4,148,300 would remain available for distribution to Class Members once attorneys' fees and litigation costs ($1.18 million), incentive awards ($32,000), and costs of settlement administration ($539,700) are subtracted from the Fund. The following chart illustrates how the fund would be distributed among the four different groups:

**FirstGroup FCRA Settlement – Fund Distribution Chart**



A = ▢ =Disclosure Fund Participant Group    ($1,187,533.84)

B = ■ = No Authorization Fund Participant Group   ($2,090,120.96)

C = ■ = No Authorization Terminated Fund Participant Group   ($288,597.23)

D = ■ = Adverse Action Fund Participant Group   ($582,047.97)

Under the Plaintiffs' proposed distribution plan, approximately $1.19 million will be made available to 107,071 Class Members who suffered only the most technical violation alleged in Plaintiffs' Third Amended Complaints.  These Class Members were allegedly the subject of a criminal background check report without first receiving a disclosure, in a document consisting solely of the disclosure, stating that a consumer report may be obtained about the Class Members for employment purposes ("the Disclosure Violation").  The Settlement Agreement refers to these Class Members as "Disclosure Fund Participants."

An additional approximately $2.09 million will be made available to 29,325 Class Members who suffered the Disclosure Violation and who were the subject of a criminal background check report obtained from USIS or AFR without their written authorization ("the Authorization Violation"), but who suffered no adverse action on account of that criminal

background check report. The Settlement Agreement refers to these Class Members as "No Authorization Fund Participants."

A third sub-fund, amounting to approximately $289,000, will be made available to the 302 individuals who allegedly suffered all three violations: that is, they suffered the Disclosure Violation, their employment was terminated based in whole or in part on a criminal background check report, and the Defendants procured criminal background check reports about them before they signed a form authorizing Defendants to procure criminal background check reports about them. The Settlement Agreement refers to these Class Members as "No Authorization Terminated Fund Participants."

Finally, $582,000 will be made available to 6,898 Class Members who suffered the Disclosure Violation and who suffered adverse action based in whole or in part on a criminal background check report without first receiving a copy of their criminal background check report and the FTC's Summary of Rights. The Settlement Agreement refers to these Class Members as "Adverse Action Fund Participants." The Adverse Action Fund Participants are different from the No Authorization Terminated Fund Participants because they signed the Defendants' Part I Form, authorizing the Defendants to obtain criminal background check reports about them from USIS.[3]

Only those Class Members who timely returned claim forms will receive proceeds from

---

[3] Adverse Action Fund Participants whose employment was terminated based on a criminal background check report obtained from USIS were also nearly always the subject of a consumer report procured from AFR. Plaintiffs contend that Adverse Action Fund Participants did not authorize Defendants to obtain AFR reports about them, even though these class members signed the Part I Form. According to Plaintiffs, the Part I Form only permitted the Defendants to obtain consumer reports from USIS, or its successor, HireRight, Inc., and not from AFR. Defendants disputed Plaintiffs' interpretation of the Part I Form and also contended that AFR was not a "consumer reporting agency" within the meaning of the FCRA, and thus that the authorization provisions of the FCRA did not apply. The money that Adverse Action Fund Participants will receive as part of the Settlement Agreement will also serve to compensate them for the Defendants' alleged procurement of consumer reports from AFR without Class Members' written authorization.

the settlement.

## 2. Non-Monetary Relief

In addition to the substantial monetary relief discussed above, Defendants have agreed to ensure that they remain in compliance with the FCRA in the future when procuring and using consumer reports for employment purposes. Specifically, Defendants have agreed to: (1) provide employees and employment applicants a copy of the their consumer reports and the FTC's Summary of FCRA Rights at least seven days before taking adverse action based in whole or in part on those consumer reports; (2) disclose to employees and employment applicants – in a document that does not include a release of liability – that Defendants may procure a consumer report about them for employment purposes; and (3) not procure consumer reports about employees and employment applicants until they have authorized in writing the procurement of those reports. Class Counsel regard this undertaking by Defendants to be a substantial benefit to the Class and to the thousands of people who will apply for or obtain employment with Defendants in the future.

## C. Notice and Claims Administration

### 1. Original Mailing of Notice

On April 30, 2011, the Settlement Administrator mailed notice to approximately 142,000 Class Members.[4] That mailing included all Class Members except 1,623 Class Members for whom Defendants initially were unable to provide address information. Ex. B (Patton Decl. ¶4-5). On May 9, 2011, the Settlement Administrator used a skip-tracing database in an effort to obtain addresses for the 1,623 Class Members with missing address information and mailed notice to an additional 1,405 Class Members. *Id.* ¶5. On May 11, 2011, Defendants provided

---

[4] The Settlement Administrator ran all Class Members' addresses through the United States Postal Service's National Change of Address database prior to mailing. Ex. B ¶4.

address information for 686 of the 1,623 Class Members for whom no address information was originally provided. *Id*. ¶6. On May 12, 2011, the Settlement Administrator mailed notice to those individuals using the addresses provided by Defendants. *Id*. ¶6.

Of the 143,585 Class Members, approximately 17,953 had their notices returned as undeliverable. *Id*. ¶14. The Settlement Administrator traced those Class Members for new addresses using a locator service and found possible new addresses for 14,977 Class Members. *Id*. The Settlement Administrator subsequently re-mailed a Class Notice to each of those 14,977 Class Members.[5] *Id*.

## 2. Subsequent Mailings of Notice

In late June, the parties discovered that 831 Class Members had been misclassified, meaning that the Settlement Administrator sent the Class Members a notice indicating membership in the wrong participant group. The cause of the misclassification was the parties' reliance on a large employee database maintained by Defendants through a third-party vendor, which database included copies of the FCRA authorization forms from the year 2007 that were at issue in these cases. Further investigation established that a number of the authorization forms uploaded to the database were not signed or were otherwise arguably ineffective. As a result, these 831 individuals (who returned unsigned or otherwise arguably ineffective FCRA authorization forms to the Defendants) should have been classified as members of the No Authorization Group or the No Authorization Terminated Group – depending on whether the class member's employment was terminated based on a consumer report. On June 13 and 15, 2011, pursuant to this Court's order, the 831 individuals were mailed new notices, with extended deadlines to return claim forms, objections, and opt-out notices. *Id*. ¶7.

---

[5] Throughout the claims period, the Settlement Administrator answered over 2,871 phone calls from class members. Ex. B ¶11.

On June 17, 2011, the Settlement Administrator sent new notices to nine additional individuals who should have been classified as members of the No Authorization Group, but who were originally mailed Disclosure Group notices. *Id*. ¶8. These nine individuals were mailed corrected notices with extended deadlines to return claim forms, objections, and opt-out notices. *Id.*

On June 24, 2011, the Settlement Administrator mailed notice to 278 Class Members who may not have received notice by way of the original April 30, 2011 mailings on account of incorrect social security number information contained in Defendants' original data production. *Id*. ¶9. These notices included extended deadlines to return claim forms, objections, and opt-out notices. *Id*.

In late June 2011, the parties discovered that the incorrect social security number information contained in Defendants' original data production may have resulted in certain individuals being placed in the wrong participant group and, thus, receiving the wrong type of notice. *Id*. ¶10. On July 12, 2011, pursuant to this Court's order, 42 individuals who may have been misclassified due to this data problem were mailed new notices and given an August 15, 2011 deadline to return claim forms, objections, or opt-out notices. *Id.*

### 3.     Response From Class Members

To date, 32,115 Class Members (or 22.4% of the class) who have not opted out have returned valid claim forms, and 1,290 Class Members returned defective or untimely claim forms.[6]   *Id*. ¶20-21.   Twenty-five Class Members filed objections, and due in large part to multiple pending state court lawsuits in California against First Transit and First Student alleging

---

[6] The final number of timely claim forms received by the Settlement Administrator cannot be determined at this time. There are two class members who were given until August 15, 2011 to return a claim form, returned a defective claim form, and were given an additional ten days to correct the deficiency. As a result, these two claim forms are still outstanding. *See* Ex. B ¶21.

similar claims under the California Investigative Consumer Reporting Agencies Act ("ICRAA"), 1,278 class members opted out.[7] *Id.* ¶15.

Throughout the claims period, approximately 50 individuals contacted the Settlement Administrator about being placed in the wrong participant group. *Id.* ¶12. Most of the individuals claimed that they should be assigned to a different group because one of the Defendants terminated their employment or rejected them for employment due to a criminal background check report. The Defendants investigated the circumstances of sixteen of these misclassification complaints and discovered only two class members who had a reasonable likelihood of being misclassified. The other fourteen misclassification complaints were unsubstantiated. Most of these individuals were terminated or not hired for a reason that had nothing to do with a consumer report, had no derogatory criminal record information on their consumer report, or were terminated or not hired after Defendants implemented FCRA-compliant criminal background check procedures.

Due to the expense of investigating each claim of misclassification and the low rate of actual misclassification, the parties elected not to investigate the other 34 complaints of misclassification, instead relying on the settlement notice which informed Class Members if they were displeased with their assigned participant group, they could object, opt out, or not participate in the settlement.

## II.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

---

[7] Twelve class members filed untimely opt out notices. Ex. B ¶15, 17. At the final approval hearing, the parties will ask the Court to decide whether these twelve individuals should be allowed to opt out or whether they should be bound by the judgment in this case. Defendants contend that these individuals should not be permitted to opt out. Plaintiffs disagree. In addition, 20 class members initially filed opt out notices and then later filed claim forms, and six other class members filed claim forms at the same time as they filed opt out notices. *Id.* ¶15, 18. Defendants contend that in those 26 instances, the claim forms should control over the opt out notices, while Plaintiffs contend the opt out notices should control. The parties will also ask the Court to decide this issue.

## A.       **Legal Standard**

The standard against which a proposed class settlement should be evaluated is whether the settlement taken as a whole is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). The determination whether to grant approval of a class action settlement is within the sound discretion of the Court. *See Isby*, 75 F.3d at 1196-97 (applying abuse of discretion standard to review of district court's approval of class action settlement).

Federal courts "naturally favor the settlement of class action litigation." *Id.* at 1196. *See also Uhl v. Thoroughbred Tech. & Telecomm., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002) ("Federal courts favor settlement, so the district court's inquiry into the settlement structure is limited to whether the settlement is lawful, fair, reasonable and adequate."). "[C]ourts look upon the settlement of lawsuits with favor because it promotes the interests of litigants by saving them the expense and uncertainties of trial, as well as the interests of the judicial system by making it unnecessary to devote public resources to disputes that the parties themselves can resolve with a mutually agreeable outcome." *Hispanics United v. Village of Addison*, 988 F. Supp. 1130, 1149 (N.D. Ill. 1997) (internal citations omitted).

Courts within the Seventh Circuit evaluate five factors when determining whether a class action settlement meets the standard of being fair, reasonable, and adequate. The relevant factors include: (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer, (2) an assessment of the likely complexity, length, and expense of the litigation, (3) an evaluation of the amount of opposition to settlement among affected parties, (4) the opinion of competent counsel, and (5) the stage of the proceedings and the amount of discovery completed

at the time of settlement.  *See Isby*, 75 F.3d at 1198-99.  All of the above factors weigh in favor of final approval of the settlement in these cases.

**B.** **Application of the Seventh Circuit's Factors Strongly Support Final Approval of the Settlement Agreement.**

**1.** **Plaintiffs' case on the merits, balanced against the Defendants' settlement offer.**

The Seventh Circuit has stated that the single "most important consideration" bearing on the fairness, reasonableness, and adequacy of a class settlement is "the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement." *Isby*, 75 F.3d at 1199.  Here, the monetary relief provided by Defendants is sufficient to compensate Class Members' claims, particularly given the risks in proceeding forward.

The FCRA sets up a two-tiered system for allocating damages to plaintiffs who are aggrieved by FCRA violations, depending on whether the defendant's violation was willful or negligent.  15 U.S.C. § 1681n & o.  If the plaintiff proves that the defendant's violation was willful, then the plaintiff is entitled to the greater of either his actual damages or statutory damages of between $100 and $1,000 per violation as well as, if appropriate, punitive damages. *Id*. § 1681n; *Safeco v. Burr*, 551 U.S. 47 (2007) (holding that a FCRA violation is willful if the plaintiff proves that "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless").  However, if the defendant's FCRA violation was merely negligent, then a plaintiff is entitled to recover only his actual damages. *Id*. § 1681o.  Under either theory, a prevailing plaintiff is entitled to recover attorneys' fees and costs.

The FCRA's willfulness standard is important because, in the absence of willfulness, Plaintiffs must prove that Defendants' alleged FCRA violations caused them actual damages in

order to recover.  15 U.S.C. § 1681o.  There is little question that, in the overwhelming number of alleged Disclosure Violations and Authorization Violations at issue in these cases, the Class Members did not suffer any actual damages.  This means that if the Plaintiffs' cases proceeded, and they failed to prove that Defendants' alleged FCRA violations were willful, the bulk of the Class Members' claims would be dismissed, possibly at summary judgment.

### a.    Disclosure Fund Participants

The proposed recovery for Disclosure Fund Participants, *i.e.*, those Class Members who only suffered the Disclosure Violation, is eminently reasonable.  Again, Plaintiffs contend that the disclosure they received from Defendants did not consist *solely* of a disclosure stating that a consumer report may be obtained about them for employment purposes.  *See* 15 U.S.C. § 1681b(b)(2)(A)(i).  Specifically, Plaintiffs argue that the disclosure form that they received from Defendants contained a release of liability, in which Plaintiffs purported to forfeit any claims that they had against a criminal background check company, USIS.  The form also authorized USIS to provide information about them to other employers who did not otherwise have a permissible purpose to obtain the report.  *See* 15 U.S.C. § 1681b(a).

Defendants have vigorously defended the allegations brought by the Disclosure Subclass, arguing that the disclosures that Defendants provided to Class Members fully complied with the requirements of 15 U.S.C. § 1681b(b)(2)(A)(i) and that there was no case law to the contrary.  Defendants cited the recent decision in *Burghy v. Dayton Racquet Club, Inc.*, 695 F. Supp. 2d 689 (S.D. Ohio 2010), to support their position that the presence of release language did not render the disclosure violative of the FCRA.  Moreover, Defendants argued that the disclosure form that they used during the class period was supplied to them by one of the largest and most reputable consumer reporting agencies in the country and that, therefore, Defendants' use of that

form could not be found to be a willful violation of the FCRA.

In light of the significant risks that Defendants have identified in proceeding on these claims and the technical nature of the alleged violation, the proposed settlement is more than reasonable as it applies to the Disclosure Fund Participants. At the end of claims period, 20.9% of the eligible Disclosure Fund Participants returned timely claim forms, *see* Ex. B ¶22,[8] meaning that each participating Disclosure Fund Participant will receive approximately $53. Courts have approved FCRA settlements awarding far less for similarly technical violations, even approving coupon-based settlements. *Hanlon v. Aramark Sports, LLC*, No. 09-465, 2010 WL 374765, *5 (W.D. Pa. 2010) (approving FACTA credit-card truncation settlement agreement that provided each class member $50 worth of merchandise at Defendant's retail store); *Barel v. Bank of America*, 255 F.R.D. 393, 404 (E.D. Pa. 2009) (approving settlement agreement that provided four months of free credit monitoring, with a retail value of $52, to consumers who were the subject of a consumer report procured without a permissible purpose); *Colella v. Univ. of Pittsburgh*, 569 F. Supp. 2d 525, 534 (W.D. Pa. 2008) (approving FACTA credit-card truncation settlement agreement that provided each class member a free ticket, with a face value of $10, to one of two Pittsburgh spring football games).

### b. No Authorization Fund Participants

The No Authorization Fund Participants are Class Members who suffered the Disclosure Violation and who were the subject of a consumer report procured, under Plaintiffs' theory, without their legally effective authorization. Defendants argued that all of the No Authorization

---

[8] For purposes of this Memorandum, the participation rates for each participant group assume that the Court will deem the thirty-eight class members noted in fn.7, *supra*, to have effectively opted out. If the Court does not deem some or all of these thirty-eight individuals to have effectively opted out, then the participation rates for some or all of the participant groups will marginally increase, and the recovery per class member will marginally decrease.

Fund Participants authorized the criminal background checks, based on the authorization forms that they had previously executed as Laidlaw employees, so that at most, any FCRA violation was technical and non-willful. None of the No Authorization Fund Participants suffered an adverse action based on a consumer report. Accordingly, it would be difficult (if not impossible) to prove that any of these Class Members suffered any actual damages on account of the Defendants' alleged violations. Thus, these Class Members faced the risk that even if Defendants were ultimately found to have violated the FCRA, the Class Members would obtain no recovery.

Under the terms of the proposed Settlement, the No Authorization Fund Participants who return claim forms will split approximately $2.09 million. At the end of claims period, 26.5% of the eligible No Authorization Fund Participants returned timely claim forms, *see* Ex. B ¶22, meaning that each participating No Authorization Fund Participant will receive approximately $269. No Authorization Fund Participants would have difficulty doing better at trial, even if they were certain to prove – over Defendants' strenuous objections – that Defendants violated the FCRA and that they did so willfully. Given the No Authorization Fund Participants' uncertain recovery and courts' approval of FCRA settlements awarding far less for similar violations, the proposed settlement is more than fair and reasonable. *Id.*

### c. No Authorization Terminated Fund Participants

The No Authorization Terminated Fund Participants are those Class Members who, based on company records (as described in the Settlement Agreement), never signed a Part I Form authorizing the Defendants to procure a consumer report about them (or signed the Part I Form after Defendants procured a consumer report about them), but whose employment was nevertheless terminated based in whole or in part on a consumer report that Defendants procured

from USIS. Before their employment was terminated, No Authorization Terminated Fund Participants did not receive both a copy of their consumer report and the FTC's Summary of FCRA Rights. No Authorization Terminated Fund Participants also suffered the alleged Disclosure Violation.

Because these Class Members have what Class Counsel believe to be a strong argument that Defendants' alleged FCRA violations caused them to suffer actual damages (unlike the vast majority of other Class Members), their proposed recovery is the highest. Plaintiffs maintain that if the Defendants had waited until No Authorization Terminated Fund Participants signed a Part I Form before procuring a criminal background check report about them, the No Authorization Terminated Fund Participants would have continued working for Defendants for some significant period of time. Many of these Class Members were union members and had been instructed by their union leaders not to sign the Part I Form until the unions had an opportunity to negotiate the terms of the background checks with First Transit and First Student. In all likelihood, therefore, the No Authorization Terminated Fund Participants would have continued to work and earn wages until the labor dispute concerning whether they would be required to sign the Part I Form was ironed out and Defendants had the written authorization necessary to obtain a criminal background check report.

Recognizing this alleged claim for actual damages, the Settlement Agreement provides that the No Authorization Terminated Fund Participants who return claim forms will split approximately $289,000. At the end of the claims period, 51.7% of the eligible No Authorization Terminated Fund Participants returned timely claim forms, *see* Ex. B ¶22, meaning that each participating No Authorization Terminated Fund Participant will receive approximately $1,850. This outcome is reasonable because it appropriately compensates Class

Members for their alleged actual damages claim.

### d. Adverse Action Fund Participants

The Adverse Action Fund Participants are Class Members who authorized Defendants to procure consumer reports about them from USIS, but who nevertheless did not receive a copy of their USIS consumer report and/or the FTC's Summary of Rights before one of the Defendants took adverse action against them based on the report. These individuals also suffered the alleged Disclosure Violation.[9] Defendants argued that they did not violate the FCRA because termination decisions were based on publicly available court records, which Defendants contend are <u>not</u> "consumer reports" prepared from databases within the meaning of the FCRA, and that in any event, Defendants' practices and policies substantially complied with the FCRA because they assured that employment decisions would be made on accurate information and that affected individuals would have an opportunity to dispute any inaccurate information.

The monetary relief provided to the Adverse Action Fund Participants who returned claim forms is more than reasonable. The Settlement Agreement provides that Adverse Action Fund Participants whose employment was terminated pursuant to the Defendants' company-wide background checking procedure will receive $750 if they return a claim form. This is close to the maximum recovery of statutory damages that would be available for a willful violation of the FCRA. The remaining Adverse Action Fund Participants, who were employment applicants rejected because of a consumer report (or former employees who worked for the company for a very short time before being fired because of a criminal background check), will split the approximately $399,000 that remains of the Adverse Action Fund. At the end of claims period, 24.8% of the eligible Adverse Action Fund Participants (job applicants) returned timely claim

---

[9] Plaintiffs also maintain that the Defendants procured from AFR a consumer report about some of the Adverse Action Fund Participants without their written authorization. *See supra* p.8 n. 3.

18

forms, *see* Ex. B ¶22, meaning that each rejected job applicant will receive approximately $251. This outcome is also more than reasonable, particularly considering the early stage of the litigation. Not only is the recovery more than 2½ times greater than the minimum statutory damages of $100 for a willful violation of the FCRA, but the rejected applicant group likely suffered no actual damages at all and, absent a settlement, would have encountered more substantial problems of proof, such as causation, than the terminated incumbent employee group.

2. **The likely complexity, length, and expense of further litigation and the public interest.**

This litigation is complex, involving 143,585 Class Members, who applied to work or worked for Defendants in hundreds of locations in nearly all fifty states. Unless the Settlement Agreement is approved, the duration of the litigation could span years beyond the nearly two years already elapsed, and would include briefing on the class certification issue, depositions, trial, and appeals.

Defendants have demonstrated a commitment to defend these cases through and beyond trial, if necessary. Defendants are represented by well-respected and capable counsel. A recovery for the class as the result of a favorable judgment, if obtained, would occur only after hard fought and costly discovery, a trial, post-trial motions, and lengthy appeals. There is no question that this settlement produces a recovery at far less expense, much sooner and, most significantly, with more certainty than if the parties were to litigate the matter to its conclusion.

The settlement also advances the interests of judicial economy and avoids the substantial time and expense that would be necessary to litigate these cases and is, therefore, in the public interest. *See Am. Civil Liberties Union of Ill. v. U.S. Gen. Serv. Admin.*, 235 F. Supp. 2d 816, 819-820 (N.D. Ill. 2002) (citing *Hiram Walker & Sons*, 768 F.2d 888-89) ("the settlement

furthers the public interest by avoiding costly, unnecessary and uncertain litigation in favor of a mutually beneficial resolution of class-action lawsuits").

### 3. The amount of opposition to the settlement and the reactions of members of the class to the settlement.

The settlement enjoys the support of the overwhelming majority of the members of the class. Of 143,585 Class Members, the Settlement Administrator (or the parties) received only twenty-five objections, and one of those objections was filed by a Class Member who subsequently opted out. Ex. B ¶19. It is extremely unusual *not* to encounter some objections or requests for exclusion to proposed class action settlements. *Hiram Walker & Sons,* 768 F.2d at 891-92 (stating that "without more, a large number of objectors will not result in the reversal of a district court's approval of a consent decree"). In addition, there were approximately 1,278 Class Members who opted out of the settlement. *Id.* ¶15. As the Court will recall, the vast majority (approximately 1,121) of the persons opting out are plaintiffs in pending litigation in California state court. Neither the objections nor the opt outs should stand in the way of the Court approving this settlement.

### a. Objections

The objections to the proposed settlement agreement, which are attached as Appendix 4 to Exhibit B, can be divided into three categories: (1) ten individuals objected to the settlement claiming that they were placed in the wrong participant group; (2) eight individuals objected contending that the amount of the settlement is too low; and (3) seven individuals objected contending that the Defendants did nothing wrong and should not be liable at all for the claims alleged in these cases.[10]

---

[10] The objectors who claim that they were misclassified are Abney, Barnes, Bettis, Coleman, Ennis, Horan, Hinton, Jackson, Jett, and Mellish. The objectors who claim that the settlement amount is too low are Ashford, Itzhaki, King, Lang, Letourneau, McQueen, Schultz, and Woods. The objectors who claim

(1)     The Defendants have investigated the ten complaints of misclassification and determined that it is reasonably likely that six claims are meritorious.  Whether stated explicitly or by implication, each of the ten objectors claims that he or she belongs in one of the adverse action groups, rather than in either the Disclosure Group or No Authorization Group to which they were assigned.  To investigate these claims, the Defendants and their counsel reviewed evidence submitted by the objectors, the results of the criminal background check reports ordered by FirstGroup during the class period, various documentation regarding FirstGroup's security review process, records of the objectors' termination dates, and, where appropriate, the objectors' applicable Part I forms.  Based on this investigation, Defendants have recommended and the parties have agreed to reclassify six of the ten objectors:  Horan, Bettis, Jackson, Abney, Jett, and Mellish.[11]  The other four objectors (Hinton, Barnes, Coleman and Ennis) should not be reclassified because, based on the records reviewed, none of the four received a derogatory criminal background check report, necessarily making them ineligible for any adverse action group.

(2)     The eight objections contending that the settlement provides too little compensation do not raise concerns that should stand in the way of approval.  Of these eight objectors, six are members of the Disclosure Group, one was a member of the Adverse Action (Terminated) Group until she opted out, and one is a member of the Adverse Action (Applicant) Group.  As discussed above, the members of the Disclosure Group almost certainly suffered no actual damages as a result of the alleged FCRA violations they suffered.  Nevertheless, the participating Disclosure Group members will receive $53 for a technical FCRA violation that the

_____

that the Defendants should not be held liable are Bloom, Blakeman, Denby, Dickinson, Dunn, Morrison, and Samrow.  *See* Ex. B at Appendix 4.

[11]     Horan and Jackson have been reassigned to the No Authorization Terminated Group; Bettis, Abney, Jett, and Mellish have been reassigned to the Adverse Action (Terminated) Group.

Class Members risked losing at trial or summary judgment due to the difficulties associated with proving willfulness. The settlement amount is reasonable given the risks associated with pressing forward.

Additionally, the settlement provides sufficient monetary compensation to Adverse Action Group members – *i.e.*, those Class Members who suffered adverse action based on a consumer report without first receiving a copy of the report and/or the FTC's Summary of FCRA Rights. These Class Members will receive compensation that falls well within the statutory damages range of $100 to $1,000 for FCRA violations that caused little, if any, actual monetary injury.[12] As far as Class Counsel can determine, the proposed settlement in these cases would represent the largest monetary recovery in history for a class action lawsuit involving employment-related FCRA claims.[13] In light of that fact, it is difficult for Class Members to credibly argue that the relief contemplated by the proposed settlement is insufficient.

(3)    Finally, the seven objections that contend that Defendants should not be held liable in these cases certainly do not undermine the fairness or adequacy of the settlement. To the contrary, if Plaintiffs' claims are as meritless as these seven objectors contend, then the settlement more than adequately compensates the Class Members for their alleged FCRA claims.

**b.    Opt Outs**

---

[12] Plaintiffs never claimed that the Defendants were prohibited from terminating or not hiring these Class Members based on the content of their consumer reports. Rather, Plaintiffs simply argued that Defendants were required, under the FCRA, to provide these Class Members a copy of their consumer report and the FTC's Summary of FCRA Rights before taking adverse action against them.

[13] In 2009, Wal-Mart settled class claims brought under § 1681b(b)(3) for $4.0 million. *See Beverly v. Wal-Mart Stores, Inc.*, No. 3:07 CV 469 (E.D. Va.). In 2011, Vitran Express settled class claims brought under §§ 1681b(b)(3) & 1681b(b)(2) for $2.6 million. *See Hall v. Vitran Express, Inc.*, No. 09 CV 800 (N.D. Ohio). In 2011, NCO Financial Systems settled class claims brought under §§ 1681b(b)(3) & 1681b(b)(2) for $1.7 million. *See Daily v. NCO Fin. Sys., Inc.*, No. 3:09 CV 031 (E.D. Va.).

There are approximately 1,278 Class Members who have opted out of the settlement, representing less than .9% of the class. Ex. B ¶15. As Class Counsel informed the Court at the preliminary approval hearing, that number is not surprising. Currently, there are a number of state court actions pending in California that involve more than 1,100 current or former First Transit or First Student employees who brought their own similar claims under the ICRAA, which prohibits a plaintiff from recovering under both the ICRAA and the FCRA for the same violation. As a result, the California opt outs (1,121 of the 1,278 total opt outs), on the advice of their counsel, have elected to pursue claims under the ICRAA rather than participate in this settlement. Ex. B ¶15. The only way to pursue those claims is to opt out of these cases. Far from suggesting that the proposed settlement in these cases is inadequate, the significant number of California opt outs suggests that (1) the class notice adequately informed Class Members that by participating in this settlement, they may be giving up claims under state law, and (2) the ICRAA's unique statutory scheme provides a more desirable claim for certain Class Members.

In short, neither the objections or opt outs received to date undermine the reasonableness, fairness, or adequacy of the parties' proposed settlement.

### 4. The opinion of competent counsel.

Class Counsel are experienced and accomplished class action litigators. *See* Ex. C (Piers Decl. ¶3). In the considered opinion of lead counsel, the settlement achieves a more than favorable result for the Class Members under the circumstances. *Id.* ¶5. Class Counsel's recommendation, while not conclusive, should be given a presumption of reasonableness and is entitled to significant weight. *Hispanics United*, 988 F. Supp. at 1170 (internal citations omitted).

### 5. The stage of the proceedings and the amount of discovery completed.

These cases settled at a relatively early stage, but only after the parties exchanged extensive information about Defendants' criminal record policies, reviewed hundreds of personnel files and consumer reports, and reviewed hundreds of other documents related to Defendants' merger with Laidlaw entities. Additionally, Defendants allowed Plaintiffs to conduct lengthy interviews of two corporate representatives: First Student's International Vice President of Safety, Gary Catapano, who had substantial involvement in crafting First Transit's and First Student's procedures for conducting criminal background checks during the relevant time period, and Russ Iddings, Director of Human Resources for FirstGroup America, who confirmed Defendants' current compliance with the FCRA. Plaintiffs also subpoenaed and obtained information from Defendants' criminal background check vendor, USIS (n/k/a HireRight), about Defendants' communications with USIS related to Defendants' criminal background check procedures. Finally, Plaintiffs received a detailed, forty-one page affidavit from Defendants' corporate representative describing how Defendants determined how many Class Members were included in each participant group.

As a result of this exchange of informal and formal discovery and good-faith negotiations, counsel are aware of the strengths and weaknesses of their claims and are therefore well-prepared to reliably gauge the reasonableness of the settlement.

## III.    THE NOTICE PROVIDED TO THE CLASS SATISFIES RULE 23(e) AND DUE PROCESS.

The manner and form of notice provided to the Settlement Class is fully compliant with the requirements of Rule 23(e)(1) and Due Process. The purposes of a class notice are to provide interested parties notice of the settlement, their right to object and exclude themselves, and enough information about the terms of the settlement so that they can evaluate their options. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

Within the first two weeks of the claims period, the Settlement Administrator mailed Class Notices to the last known addresses of 141,954 of the 143,585 Class Member via first class mail. Ex. B ¶4. As set forth in Part IV. D. of the Settlement Agreement, the Settlement Administrator ran all Class Member addresses through the United States Postal Service's National Change of Address database prior to mailing. *Id.* ¶4. Of the 143,585 Class Members, 17,953 had their Class Notices returned as undeliverable. *Id.* at ¶14. Those 17,953 Class Members were skip-traced, and based on the results of the trace, 14,977 Class Notices were re-mailed to new addresses. *Id.*

The Settlement Administrator also has maintained a toll-free telephone number for Class Members to call to obtain the Class Notice, if requested, and obtain information about the settlement. *Id.* at ¶11. Finally, the Settlement Administrator maintained a website that provided information about the settlement and described how a Class Member could obtain a claim form. *Id.* ¶13. As of this date, the Settlement Administrator has spoken with approximately 2,871 Class Members by telephone. *Id.* at ¶11.

Rule 23(e) and the Due Process Clause require that notice be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." 4 Newberg on Class Actions § 11:53 (4th ed. 2010). That standard has been more than satisfied here.

## IV. THE REQUIREMENTS OF RULE 23(a) and 23(b)(3) HAVE BEEN SATISFIED.

### A. The Requirements of Rule 23(a) Are Satisfied.

In these cases, the proposed class satisfies each of the four "class-qualifying criteria," *Amchem*, 521 U.S. at 621, specified in Rule 23(a), as follows:

**Numerosity:** There are 143,585 individuals included in the proposed Settlement Class.

**Commonality:** The common issues of law and fact in these cases include, among others: whether Class Members terminated or not hired by Defendants due to a criminal background check report received a copy of their consumer report and the FTC's Summary of FCRA Rights before they suffered adverse action; whether Defendants procured consumer reports about Class Members without their written authorization; whether Defendants disclosed to consumers in a document consisting solely of the disclosure that a consumer report may be obtained about them for employment purposes; and if Defendants violated the FCRA, whether their violations were willful.

**Typicality:** The claims of the Named Plaintiffs and the claims of absent Class Members all "arise from the same practice or course of conduct . . . and . . . are based on the same legal theory," *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983), namely whether Defendants' policies and procedures with respect to the use of criminal background check reports complied with the requirements of the FCRA. At least one of the Named Plaintiffs belongs to each of the three proposed sub-classes defined in the settlement agreement.

**Adequacy of Named Plaintiffs and Class Counsel:** There are no disabling conflicts between the Named Plaintiffs and the class, there are no issues of allocation between present and "future" claimants, and Class Counsel are experienced and accomplished in class litigation.

### B. The Requirements of Rule 23(b)(3) Are Satisfied.

Rule 23(b)(3) requires both "predominance" and "superiority." Both are satisfied here. The Class Members share one or more of the same three claims, namely that Defendants procured or used consumer reports about them without following the requirements of 15 U.S.C. §§ 1681b(b)(3), 1681b(b)(2)(A)(i), or 1681b(b)(2)(A)(ii). Moreover, the individual prosecutions

of claims by the approximately 143,585 members of the plaintiff class would not be feasible given the relatively small size of Class Members' damages. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th 1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").[14]

## V.    THE AGREED UPON ATTORNEYS' FEES ARE REASONABLE AND WITHIN THE RANGE OF POSSIBLE APPROVAL.

Under the proposed settlement agreement, and subject to the Court's approval, Class Counsel will be paid $1.18 million from the Settlement Fund for costs, litigation expenses, and attorneys' fees. Ex. A (Sec. X). Pursuant to the Settlement Agreement, and for settlement purposes only, Defendants do not contest Class Counsel's entitlement to these fees and costs, nor do Defendants challenge the reasonableness of the amounts. Plaintiffs' request, which is 20% of the common fund created by the negotiated settlement, fairly represents the market rate of Plaintiffs' attorneys' services, had their fee been negotiated with the purported class at the outset of the litigation. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (standard "benchmark" of 25% of common fund, paid from the fund, is fair and reasonable); *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001) ("When deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); *Buckholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (holding that one-third of a common fund constitutes a reasonable attorneys' fee); *McMahon v. Olivier Cheng Catering & Events, LLC,* No. 08 CV 8713, 2010 WL

---

[14] Because the parties are requesting class certification for settlement purposes only, the Court "need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. 591, 620.

2399328, *7 (S.D.N.Y. March 3, 2010) (same); *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, 97 C 7694, 2001 WL 1568856, *4 (N.D. Ill. Dec. 10, 2001) (same).

## VI. THE PROPOSED INCENTIVE AWARD IS REASONABLE AND WITHIN THE RANGE OF POSSIBLE APPROVAL.

Under the Settlement Agreement, subject to Court approval, the six Plaintiffs who spent the most time participating in this litigation – Tasha Joshaway, Michael Yurkowski, George Beckett, Debbie Goin, Elizabeth Hunter, and William Garraughty – will receive a modest $5,000 incentive award, and Pennie Johnson and Linda Stoike, who were added as Plaintiffs in the Third Amended Complaint, will receive an even more modest $1,000 incentive award.  All of the Named Plaintiffs provided valuable assistance to Class Counsel by responding to numerous inquiries from Class Counsel regarding, among other things, the circumstances of their termination from the Defendants' employ and the Defendants' criminal background checking procedures.  Moreover, the Named Plaintiffs stepped forward despite the risk of being held liable for Defendants' costs under Rule 54(d) in the event that Defendants prevailed.  The proposed incentive awards are reasonable, particularly when compared to awards approved in other class action settlements.  *In re U.S. Bancorp. Litig*., 291 F.3d 1035, 1038 (8th Cir. 2002) (approving total incentive payments that did not exceed .35% of the total settlement); *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 463 (9th Cir. 2000) (approving incentive awards of $5,000 to each of the two class representatives in a 5,400 person class in a settlement of $1.725 million); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving incentive payment that did not exceed .17% of total settlement).

## VII. CONCLUSION

For all the reasons stated above, Plaintiffs request that the Court, enter an Order substantially similar to the one attached hereto as Exhibit D:

1.      Granting final approval to the class-wide Settlement Agreement negotiated by the parties as fair, reasonable, and adequate;

2.      Approving payment to Class Counsel in the amount of $1,180,000.00 for attorneys' fees, costs, and litigation expenses as fair and reasonable;

3.      Approving $5,000 incentive awards to Tasha Joshaway, Michael Yurkowski, Debbie Goin, George Beckett, Elizabeth Hunter, and William Garraughty; and $1,000 incentive awards to Linda Stoike and Pennie Johnson.

4.      Approving payment to Settlement Services, Inc. of $539,700 for work performed as Settlement Administrator;

5.      Ordering the Settlement Administrator to distribute checks to each Class Member who returned a valid and timely claim form, as contemplated by the Settlement Agreement;

6.      Enjoining all members of the Settlement Class from commencing, prosecuting, or maintaining any claim already asserted in and encompassed by these Actions; and

7.      Dismissing these cases with prejudice as to all Class Members who did not opt-out of the cases.

DATED:  August 30, 2011                                    /s/ Christopher J. Wilmes

Matthew J. Piers
Kalman D. Resnick
Joshua Karsh
Christopher J. Wilmes
Hughes Socol Piers Resnick & Dym Ltd.
70 West Madison Street, Suite 4000
Chicago, IL 60602
Telephone:  312.580.0100
Facsimile:  312.580.1994

*Attorneys for Plaintiffs and the Plaintiff Class*